Filed 4/10/14  P. v. Neal-Anderson CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ROBERT NEAL-ANDERSON,<br><br>Defendant and Appellant. | C070700<br><br>(Super. Ct. No. 09F07431) |

Defendant Robert Neal-Anderson stabbed David Maxey in the neck, severing his carotid artery and causing him to bleed to death within a matter of minutes.  Convicted by jury of second degree murder and found to have personally used a deadly weapon, defendant was sentenced to serve an indeterminate state prison term of 15 years to life, plus a consecutive determinate term of one year.

On appeal, defendant contends:  (1) the trial court prejudicially erred and violated his constitutional rights by instructing the jury with the former version of CALCRIM No. 570 on the heat of passion theory of voluntary manslaughter; (2) the prosecutor

1

committed prejudicial misconduct during his supplemental rebuttal argument by misstating the law with respect to heat of passion voluntary manslaughter; and (3) the trial court prejudicially erred by instructing the jury with CALCRIM No. 3471, regarding mutual combat, without also providing a bracketed portion of the instruction covering the situation in which the victim of a simple assault "responds in a sudden and deadly counterattack."

We directed the parties to submit supplemental letter briefs on the effect of our Supreme Court's decision in *People v. Beltran* (2013) 56 Cal.4th 935 (*Beltran*). Based on this decision, we conclude the portion of former CALCRIM No. 570 telling the jury to consider how a person of average disposition "would react" in the same situation did not misstate the heat of passion theory of voluntary manslaughter. Instead, this language "properly draws the jury's attention to the objective nature of the standard and the effect the provocation would have on such a person's state of mind," i.e., whether the provocation would have caused such a person to react from passion rather than from judgment. (*Beltran, supra,* at p. 954.) Defendant has forfeited his claim of prosecutorial misconduct by failing to object to the prosecutor's argument in the trial court. Nor has defendant carried his burden of demonstrating defense counsel's failure to object amounted to ineffective assistance of counsel. Finally, we also reject defendant's assertion the trial court should have provided the bracketed portion of CALCRIM No. 3471. We therefore affirm the judgment.

FACTS

Maxey was stabbed to death in his apartment on October 2, 2009, a short time after 11:00 p.m. A single stab wound to the neck severed Maxey's carotid artery, causing severe bleeding and resulting in a quick death. Maxey, a slight man of 60 years, was nude from the waist down when he was stabbed, except for the presence of a leather

2

"cock ring" at the base of his penis. Defendant admitted to stabbing Maxey, but claimed he acted in self-defense after Maxey threw bleach in his face. Defendant, a young man of 23 years with an average build, sold cocaine to Maxey and claimed the stabbing was the culmination of an argument over the amount of cocaine defendant had delivered, an agreement for defendant to engage in masturbation with Maxey as recompense, and ultimately a physical confrontation as Maxey advanced on defendant with no pants on, invading defendant's personal "boundary." More on defendant's version of events later. We begin with the prosecution's case against him.

The events leading to Maxey's death begin about an hour earlier. Around 10:00 p.m., Brenda Maddox and Theresa Larson were finishing up their laundry at a laundromat in the Bel Air supermarket shopping center near Maxey's apartment complex. Maddox and Larson also lived in the complex. Maddox and Maxey lived in adjacent second-floor apartments. Larson lived in a first-floor apartment directly below Maxey's apartment. After finishing their laundry, Maddox and Larson decided to smoke a cigarette in the parking lot. Before Maddox could light her cigarette, she saw defendant and Maxey walking through the parking lot together. They were involved in an altercation. As Larson described, it appeared as though Maxey was trying to get away from defendant, "backing up faster and faster" and "kind of dancing and circling" around while defendant followed in pursuit. As Maddox described the scene, both men were throwing punches, although defendant threw more punches than Maxey, who was "just swinging in the air." Defendant connected at least one punch with Maxey's head.

Larson asked a security guard to call 911 while Maddox stepped between the men and told defendant: "[D]on't hit my neighbor again." Defendant walked over to the security guard, who told Larson "there's nothing wrong" and that defendant was "just a little liquored up." Maddox told Maxey to get in her car. Maxey complied. He seemed

3

to be "afraid" and "was obviously glad to be getting into a car." However, rather than go straight home, Maddox drove Maxey to the nearby Bel Air because he said he wanted to buy cake mix. Larson also drove to the store and waited in her truck while Maxey went inside to make his purchase. About 10 minutes later, Maxey emerged from the store and the threesome returned to the apartment complex.

Upon their arrival, Maxey went into his apartment and found the sliding screen door to his patio was off its track, prompting him to come outside his front door and yell for Maddox. Maddox came over and found Maxey taking pictures of the screen door and saying someone had broken in. He also said: "[W]ow, he's fast." Maddox left Maxey's apartment, but told him she would be in her apartment putting her laundry away and to "knock on the wall if anything happened."

Meanwhile, Larson left her laundry in her truck and went into her apartment to rest for 20 to 30 minutes before bringing it inside. When she went out to get the laundry, she saw defendant walking up the stairs leading to Maxey's apartment. Larson said to defendant: "[A]ren't you the same man that was just in the parking lot across the street?" Defendant responded: "[N]o, no, I'm his nephew" and "I'm going to see my uncle. . . . I'm calling him right now." Defendant was using his cell phone and knocked on Maxey's door with his back to the door, standing to the side of the door as he knocked. Larson ran inside her apartment and called Maddox, telling her that "the guy who was just hitting on [Maxey] in the parking lot was knocking on his door." Maddox came outside and saw defendant walk into Maxey's apartment through the front door. She then heard "loud voices" inside the apartment, but "couldn't tell if they were arguing or laughing." A short time later, Maddox went back into her apartment.

Neither Maddox nor Larson heard any unusual noises coming from Maxey's apartment for the next 10 to 15 minutes. They then heard loud banging sounds coming

4

from the apartment. This was sometime after 11:00 p.m. As mentioned, Maxey's apartment was directly above Larson's apartment. Their apartments had identical one-bedroom floor plans. As Larson described, the first loud noises came from the bedroom area, near where the bathroom connects to the bedroom. The banging noises then moved to the living room area, culminating in "a large thump" where Maxey's body was ultimately found. After a few seconds of silence, Larson realized Maxey may be in trouble and called Maddox.

Shortly before the loud banging Maddox and Larson heard, another neighbor, Samuel Fox, was smoking a cigarette on his patio. Fox lived in a second-floor apartment in the same building. Around 11:00 p.m., Fox left his apartment to visit a friend who lived in the same complex. Fox and his friend were smoking cigarettes in the parking lot in front of his friend's building when Fox saw defendant climb up onto Maxey's patio and disappear into the apartment. Fox immediately called security. A short time later, he saw defendant run down the stairs in front of Maxey's apartment, around the building, and then south. Defendant also lived in the complex, in a separate building to the south.

When Maddox heard the banging sounds and received the phone call from Larson, she ran outside and down the stairs. Larson was already outside waiting for her. Fox also ran over to the building. He and Maddox then went up the stairs to check on Maxey. As Maddox described the scene: "The front door was wide open, and all I could see -- I started to take a step into the apartment, and I saw [Maxey's] body on the floor. . . . [¶] He was laying on the floor by the sliding glass door, and he lifted his head up and he looked at me, and then his head fell back down. He made this sound and he laid down, and when he laid down, everybody told me I screamed. I don't remember screaming. I don't remember screaming, but I must have because everything seemed to stand still out in the front. [¶] And all of a sudden, I looked back and there wasn't any blood, and all of

5

a sudden, blood just started coming everywhere." Larson called 911. Maxey died before paramedics arrived on the scene.

The condition of the apartment indicated a struggle had taken place. Police found prescription pill bottles on the living room floor with individual pills "scattered all across the living room," as well as on the stairs outside the apartment. Over 90 of these pills were identified as the prescription narcotic hydrocodone. A bag of food and soda had been spilled on the floor. There were also some areas in the apartment where plaster had been knocked off of the wall. In the bedroom, police found a bottle of bleach and determined the substance had been "thrown throughout the room." Bleach stains were found on the bedroom carpet, the sheets and pillows on the bed, and the mirror in the adjoining bathroom.

Defendant's cell phone was found in Maxey's bedroom, his wallet was found in some grass south of Maxey's apartment, and his fingerprints were found both on Maxey's patio and on the patio directly below Maxey's patio. Defendant was arrested two days later outside his apartment. His right eye appeared to be red and irritated. Defendant was in a car with his girlfriend and mother. In the trunk of the car were two pieces of luggage, a black travel bag, and a blue suitcase. The travel bag had a luggage tag indicating it belonged to defendant's mother. She had flown to California from Hawaii the day before. Inside the bag, in addition to women's clothing, police found defendant's original birth certificate and a copy of the document. Inside the suitcase, police found men's clothing. Defendant gave a statement to police. We dispense with providing a summary of the interview. For our purposes, it will suffice to say defendant admitted he lied throughout the interview.

We turn now to defendant's testimony. Naturally, he provided the only version of the events occurring inside Maxey's apartment. According to defendant, he received

disability payments from the federal government and supplemented this income by selling drugs. He sold cocaine to Maxey and the two men "kind of built a relationship, a rapport." Defendant considered Maxey to be "like family." The night of the stabbing, two or three hours before the situation in the Bel Air parking lot, Maxey paid defendant to get some cocaine for him. When they ran into each other in the parking lot, Maxey was "angry" that defendant had not yet delivered the drugs. Defendant described the altercation in the parking lot as "more of a pushing match rather than a fist fight." After Maddox and Larson intervened on Maxey's behalf, defendant went to get the cocaine for Maxey, which took "five to ten minutes." The cocaine defendant supplied to Maxey was cut with other substances, to the point that the powder sold was less than half cocaine. Defendant acknowledged he was "ripping off" Maxey, but stated he "didn't want [Maxey] buying it anyway, and [Maxey] wasn't complaining about it." Defendant delivered the cocaine to Maxey's patio. This was a prearranged drop-off spot. Maxey did not want a lot of traffic at his front door. Defendant believed Maxey would be home, so he tried to open the sliding screen door, which came off the tracks. He then knocked on the sliding glass door. When Maxey did not come to the door, defendant placed the cocaine in a vacuum on the patio and climbed down.

Defendant then made two more drug sales and returned to Maxey's apartment anywhere from 10 to 30 minutes later. This was when Larson saw him going up the stairs to Maxey's front door. Defendant acknowledged Larson asked him whether he was the man who had been in a fight with Maxey earlier that night. Defendant "felt like it wasn't her place to bother [him] about what [he] was doing," but answered he was there to visit his uncle. He then knocked on Maxey's door and took a phone call from another customer in front of Maxey's apartment. When Maxey did not answer, defendant knocked on his bedroom window. Maxey came to the door and let him inside.

7

According to defendant, Maxey was upset he had come to the front door rather than climb up onto the patio. Defendant said he had "already climbed up once" that night and "didn't want to climb up again." This conversation "basically kind of led into [Maxey] not having the right amount of cocaine." Defendant "felt bad" because he knew he had shorted Maxey, so he offered to give Maxey some of his money back. Maxey refused. Defendant then offered to take back the drugs, but Maxey said he had already used them. Defendant asked Maxey what he could do to rectify the situation. According to defendant, Maxey "kind of smiled" and said: "[W]ell, there is something you could do for me. I've had a rough day today." Defendant knew Maxey was gay and "assumed that he was talking about something sexual." Defendant was "unsure" about his own sexuality and asked Maxey what he had in mind. Maxey did not clearly state his intentions, but asked defendant to come into the bathroom with him. Defendant felt "uncomfortable," but "obligated in a sense, too," so he followed Maxey to the bathroom. Maxey removed his pants and put a leather "cock ring" around his penis. At this point, defendant told Maxey: "I'm not going to take it up the ass or nothing." Maxey laughed and said: "[T]hat's not what I had in mind." Defendant assumed he and Maxey would be masturbating in front of each other.

The situation turned violent after defendant laughed at Maxey for being unable to achieve a fully erect penis. Defendant backed out of the bathroom. Maxey followed, saying: "[C]ome here." Defendant pushed Maxey to the floor when he felt Maxey got too close, invading his personal "boundary." Maxey asked defendant what his problem was, grabbed the bottle of bleach that was in his room, and splashed defendant in the face. Defendant doubled over and spit out the bleach that got into his mouth. His eyes instantly shut and started to burn. His entire face burned. Defendant then felt an impact on the top of his head. He pulled out a pocket knife and started backing out of Maxey's

8

bedroom, saying: "I have a knife" and "I just want to get out of here." Unable to see, defendant began swinging the knife as he felt his way into the living room. Before he reached the front door, defendant heard the sound of "feet stampeding towards [him]," which caused defendant to panic and "swing[] the knife even harder." Defendant felt the knife make contact with something, but was not sure what it was. He then opened the front door, put the knife away, and tried to go down the stairs blind. After falling down "the entire staircase," defendant got up and made his way back to his apartment, where he washed out his eyes in the shower.

Defendant then rode his bike to his girlfriend's workplace. He stayed the night with his girlfriend and her mother, telling them someone tried to rob him during a drug deal and he was splashed in the face with something. The next day, defendant's girlfriend and a coworker went to defendant's apartment and moved some of his belongings out of the apartment. Defendant called his mother in Hawaii and asked her to fly out to California, which she did, bringing defendant's birth certificate. Defendant was arrested when he accompanied his girlfriend and her mother to his apartment to get the rest of his clothes.

The prosecution's theory was that defendant entered Maxey's apartment through the front door, as Maddox testified, briefly argued with Maxey, unlocked the sliding glass door, and left a short time later; he then went around to the back of Maxey's apartment, climbed up onto the patio, and reentered the apartment through the sliding glass door, as Fox testified. According to the prosecution, defendant's intent was to steal either money or prescription drugs from Maxey. When Maxey fought back, splashing defendant in the face with bleach, defendant stabbed him in the neck and left him to die. This, argued the prosecution, amounted to first degree murder, either on a deliberate and premeditated theory or on a felony murder theory. Defendant denied entering Maxey's apartment

9

through the sliding glass door, claiming he entered Maxey's apartment only once, through the front door, and Maxey threw bleach in his face after their apparent agreement to masturbate together "went sideways." This, argued defendant, necessitated the use of deadly force in self-defense. The jury rejected defendant's claim of self-defense, and also rejected the prosecution's theories of first degree murder, convicting defendant of second degree murder.

DISCUSSION

I

*Heat of Passion Instruction*

Defendant contends the trial court prejudicially erred and violated his constitutional rights by instructing the jury with the former version of CALCRIM No. 570 on heat of passion voluntary manslaughter. Defendant did not object to this instruction at trial. "Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights. [Citations.] The question is whether the error resulted in a miscarriage of justice under *People v. Watson* (1956) 46 Cal.2d 818, 299 P.2d 243. [Citation.]" (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927.) We find no error.

"Manslaughter is a lesser included offense of murder. [Citations.] The mens rea element required for murder is a state of mind constituting either express or implied malice. A person who kills without malice does not commit murder. Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter. Heat of passion arises if, ' "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' [Citation.] Heat of

10

passion, then, is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation. While some measure of thought is required to form either an intent to kill or a conscious disregard for human life, [i.e., express or implied malice,] a person who acts without reflection in response to adequate provocation does not act with malice." (*Beltran*, *supra*, 56 Cal.4th at p. 942.)

Former CALCRIM No. 570, as given to the jury in this case, provided in relevant part: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] One, the defendant was provoked; [¶] Two, as a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning and judgment; and [¶] Three, the provocation would have caused an ordinary person of average disposition to act rashly and without due deliberation. That is, from passion rather than from judgment. [¶] Heat of passion does not require anger, rage or any other specific emotion. It can be any violent or intense emotion that causes a person to act without deliberation and reflection. [¶] . . . [¶] It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. *In deciding whether the provocation was sufficient, consider whether an ordinary person of average disposition would have been provoked and how such a person would react in the same situation knowing the same facts*." (CALCRIM No. 570 (2006) italics added.)

Defendant argues the italicized language "erroneously allows the jury to reject manslaughter if it believed the average person would not have been provoked to kill

Maxey, even if it found that Maxey's actions would cause the average person to lose their judgment and act rashly." He points out CALCRIM No. 570 has been revised to replace the challenged language with the following: "In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment." (CALCRIM No. 570 (2008 rev.).)

Our Supreme Court's recent decision in *Beltran*, *supra*, 56 Cal.4th 935 requires us to reject defendant's argument that the instruction, by itself, was susceptible to such a reading. There, the Court of Appeal held the challenged language "was potentially ambiguous because it 'did not expressly limit the jurors' focus to whether the provocation would have caused an average person to act out of passion rather than judgment' and 'allowed, and perhaps even encouraged, jurors to consider whether the provocation would cause an average person to do what the defendant did; i.e., commit a homicide.' " (*Id*. at p. 954.) Our Supreme Court disagreed that the instruction was "ambiguous as written," explaining: "[U]nder ordinary circumstances, the instruction's statement that the jury should consider how a person of average disposition 'would react' under the same circumstances would have been unproblematic. As noted, the court instructed that the heat of passion principle came into play if defendant acted under the influence of intense emotion that obscured his [or her] reasoning or judgment. Telling the jury to consider how a person of average disposition 'would react' properly draws the jury's attention to the objective nature of the standard and the effect the provocation would have on such a person's state of mind." (*Ibid*.)

There was no instructional error.

## II

### *Prosecutorial Misconduct*

In a related argument, defendant claims the prosecutor committed prejudicial misconduct by misstating the law regarding heat of passion voluntary manslaughter in his supplemental rebuttal argument. We conclude the issue has been forfeited. Nor has defendant carried his burden of demonstrating defense counsel's failure to object to the prosecutor's argument amounted to ineffective assistance of counsel.

### A.

### *Additional Background*

On the first day of their deliberations, the jury sent the trial court a note stating: "Please provide a clarification between voluntary manslaughter and second degree murder." The trial court responded by referring the jury to the instructions defining these crimes. After two days of deliberation, the jury sent the trial court another note stating: "Can you please provide any further clarification (other than what we have) to explain or give clarification on the difference between first degree murder and second degree murder?" In response to this request, the trial court allowed the parties to deliver supplemental arguments to the jury.

The prosecutor argued in his supplemental closing that defendant was guilty of first degree murder on either a felony-murder theory or a premeditated and deliberate killing theory and asked the jury to consider three questions: "Question number one: Do we find -- do we as jurors believe that the defendant entered [Maxey's] balcony after 11:00 p.m. in the manner [Fox] described, right? If you find that to be yes, and you should, go on to question two. [¶] Question two is: When the defendant entered [Maxey's] balcony after 11:00 p.m. for the second time, do we believe that he had the intent to steal something from [Maxey] or to assault [Maxey], and the answer to that

should be yes based on the evidence. [¶] If the answer to both of those questions is yes, we are done here and you should return a verdict of felony murder first degree, okay? [¶] If the answer to either one of those questions is no, that you don't find that that's been proven, then your third question is: Do we find that there's been sufficient evidence to show that the defendant thought about what he did before he did it? In other words, the nature of the stab wound, all those things show that he premeditated and deliberated sufficiently. [¶] If yes, your verdict is first degree. If no, if you think it is just not enough, then your verdict is second degree murder."

Defense counsel argued in his supplemental closing that defendant provided a "reasonable explanation" concerning the events that transpired in Maxey's apartment and urged the jury to return a verdict of not guilty based on self-defense. Defense counsel then argued: "And also assuming some of you just can't find it possible to return a not guilty verdict, I would just like to add this: If the issue of provocation, that would be heat of passion, you have seen the instruction, and that's not my main theory, or imperfect self-defense, my theory, of course, is perfect self-defense, is if there's evidence that would support either of those two theories in a murder case, the People must prove beyond a reasonable doubt that these circumstances were lacking in order to establish the murder element of malice. [¶] So if you find imperfect self-defense or heat of passion, the only possible verdict is voluntary manslaughter. The appropriate and just and fair, but very difficult verdict that you should return based on the evidence that you have heard in this courtroom is not guilty."

The prosecutor then addressed heat of passion voluntary manslaughter in his supplemental rebuttal argument: "Okay. Imagine a situation, if you can, where you live on a street. It is residential. There's houses, but it is a thoroughfare, not a cul-de-sac. And you come home from work after a long day, and you turn onto your street. You live

14

at the far end, and you see there is emergency vehicles, police, fire, and you are concerned something took place. [¶] And as you drive closer to your house, you see there is an ambulance there as well, and your level of concern rises because you know the folks on your street, and you hope that no one was hurt. You get down and you see that the vehicles are actually stopped in front of your house, right? You see that they are working on someone in front of your driveway, and you get out of your vehicle and you approach and you see they are actually working on your daughter, right? [¶] Medics are tending to her. They are trying to take care of her. You are concerned, confused, disoriented. And as you go up there, you fight your way through and you hold her, right? And as you are holding her, your daughter passes. Your world is somewhat spinning out of control, and they explain to you that your daughter was running into the street to get a ball, and she was hit by a car being driven by that man, who is seated across the street holding an ice bag to his head. [¶] They tell you that guy was going through your neighborhood, he was speeding and he was drunk, right? You are going to be overcome with passion, anger, and you run over to that person because you want to take from that person what it is that they took from you, right? You run up to that person. You might even say I will kill you, you son of a bitch, and you strike out and you punch them with all the loss and emptiness that you feel over what was taken from you. [¶] You hit them in the head. They fall over backwards. Their head hits the concrete and they die, right? You have just committed a voluntary manslaughter because you purposely wanted to kill that person in the heat of passion, but that because of that passion, your reason was overcome, and any reasonable person in those circumstances would react so intensely, right? [¶] That's not what we have here."

*Analysis*

We note at the outset that defense counsel did not object to the prosecutor's argument. "To preserve for appeal a claim of prosecutorial misconduct, the defendant must make a timely objection at trial and request an admonition to the jury. [Citation.] A defendant is excused from the necessity of objecting and requesting an admonition if either would have been futile." (*People v. Najera* (2006) 138 Cal.App.4th 212, 224, citing *People v. Farnam* (2002) 28 Cal.4th 107, 167.) Defendant does not argue that objecting or requesting an admonition would have been futile. Instead, he claims his trial counsel rendered constitutionally deficient assistance by his failure to object. We disagree.

A criminal defendant has the right to the assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) This right "entitles the defendant not to some bare assistance but rather to *effective* assistance. [Citations.] Specifically, it entitles him [or her] to 'the reasonably competent assistance of an attorney acting as his [or her] diligent conscientious advocate.' [Citations.]" (*Ibid.,* quoting *United States v. DeCoster* (D.C.Cir. 1973) 487 F.2d 1197, 1202.) " 'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his [or her] "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he [or she] must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in

the outcome." ' " (*In re Harris* (1993) 5 Cal.4th 813, 832-833; accord, *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693].)

The burden of proving a claim of ineffective assistance of counsel is squarely upon the defendant. (*People v. Camden* (1976) 16 Cal.3d 808, 816.) In determining whether counsel's performance was deficient, we must exercise "deferential scrutiny" (*People v. Ledesma*, *supra*, 43 Cal.3d at p. 216) and refrain from engaging in "the perilous process of second-guessing" counsel's rational tactical decisions. (*People v. Miller* (1972) 7 Cal.3d 562, 573.) Where, as here, the record does not contain an explanation for the challenged aspect of representation, the judgment must be affirmed on appeal unless counsel was asked for an explanation and failed to provide one or there simply could be no satisfactory explanation. (*People v. Pope* (1979) 23 Cal.3d 412, 425, overruled on another ground as stated in *People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1372.) Thus, we may reverse " 'only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his [or her] act or omission.' [Citation.]" (*People v. Zapien* (1993) 4 Cal.4th 929, 980.)

Defendant argues "reasonably competent counsel would have objected" to the prosecutor's supplemental rebuttal argument because it incorrectly "informed the jury that the provocation [required for heat of passion voluntary manslaughter] must be such as to require an average person to kill." In *Beltran*, *supra*, 56 Cal.4th 935, after holding former CALCRIM No. 570 did not misstate the law, our Supreme Court explained that "the parties' closing arguments muddied the waters on this point. As the Court of Appeal majority observed, the prosecutor's examples that a reasonable person would not kill if '[y]ou stub your toe' or get 'cut off in traffic,' although hardly clear, seemed to suggest that the jury should consider the ordinary person's conduct and whether such a person would kill. As discussed, this was not the correct standard." (*Id*. at p. 954.) Here, the

17

prosecutor described a situation in which a person whose daughter is killed by a drunk driver reacts out of passion and kills the drunk driver. The crime committed in this situation is voluntary manslaughter, argued the prosecutor, because the person's "reason was overcome, and any reasonable person in those circumstances would react so intensely." While also not entirely clear, telling the jury that "any reasonable person . . . would react *so intensely*" (italics added) after describing a hypothetical situation that caused a person to react *by killing* does seem to suggest the jury should consider whether the provocation in this case was sufficient to cause a reasonable person to kill.

However, assuming the prosecutor's argument muddied the waters on the provocation issue, we nevertheless conclude there may be a satisfactory explanation for defense counsel's failure to object to the argument. The primary defense theory was that defendant acted in complete self-defense. While the jury was instructed on the lesser-included offense of voluntary manslaughter, defense counsel argued vigorously for an outright acquittal and made only brief reference to the crime of voluntary manslaughter, specifically telling the jury not to find defendant guilty of that crime. The prosecutor then made the questionable comments concerning provocation. Defense counsel reasonably could have concluded that objecting to these comments would serve only to draw the jury's attention to voluntary manslaughter—a lesser crime than murder, to be sure, but nevertheless a serious crime with serious penal consequences. (See *People v. Padilla* (1995) 11 Cal.4th 891, 958, overruled on other grounds as stated in *People v. Linton* (2013) 56 Cal.4th 1146, 1210 ["defense counsel's failure to object was probably a conscious tactical decision and a sensible one at that, taken so as not to draw the jury's attention to remarks that were, in context, fleeting"]; see also *People v. Ghent* (1987) 43 Cal.3d 739, 772 ["mere failure to object to . . . argument seldom establishes counsel's incompetence"].)

Because the record does not affirmatively disclose defense counsel had no rational tactical purpose for his failure to object to the prosecutor's comments concerning provocation, we must reject defendant's claim of ineffective assistance of counsel. (See *People v. Zapien, supra*, 4 Cal.4th at p. 980.)

### III

### *Mutual Combat Instruction*

Finally, we also reject defendant's assertion the trial court prejudicially erred by instructing the jury with CALCRIM No. 3471 without also providing a bracketed portion of the instruction covering the situation in which the victim of a simple assault "responds in a sudden and deadly counterattack."

CALCRIM No. 3471, as given to the jury in this case, provides: "A person who engages in mutual combat or who is the first one to use physical force has a right to self-defense only if: [¶] One, he actually and in good faith tries to stop fighting; [¶] Two, he indicates by word or by conduct to his opponent in a way that a reasonable person would understand that he wants to stop fighting and that he has stopped fighting; and [¶] Three, he gives his opponent a chance to stop fighting. [¶] If a person meets these requirements, he then has a right to self-defense if the opponent continues to fight. [¶] A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose."

Defendant did not object to this instruction at trial. As already mentioned, the "[f]ailure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights. [Citations.] The question is whether the error resulted in a miscarriage of justice under *People v. Watson* (1956) 46 Cal.2d 818, 299 P.2d 243. [Citation.]" (*People v. Anderson, supra*, 152 Cal.App.4th at p. 927.) The only

19

error asserted by defendant is that the following bracketed portion of CALCRIM No. 3471 should also have been provided: "If you decide that the defendant started the fight using non-deadly force and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend (himself/herself) with deadly force and was not required to try to stop fighting." However, defendant did not request this bracketed portion of the instruction be given. " 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' [Citation.]" (*People v. Guiuan* (1998) 18 Cal.4th 558, 570.) This rule applies to the situation at issue here. (*People v. Miceli* (1951) 101 Cal.App.2d 643, 649 [trial court has no sua sponte duty to provide instruction on "sudden and perilous" counter assault; "[t]he jury having been properly instructed on the law of self-defense, in the language of the code, the defendant should have proposed any amplification desired in a form that could be given"].)

Nor would the trial court have been justified in providing the bracketed portion of CALCRIM No. 3471 had such a request been made. The principle of law contained in the bracketed portion of the instruction was stated in *People v. Hecker* (1895) 109 Cal. 451: "Where one is the first wrongdoer, but his [or her] unlawful act is not felonious, as a simple assault upon the person of another, or a mere trespass upon his [or her] property, even though forcible, and this unlawful act is met by a counter assault of a deadly character, the right of self[-]defense to the first wrongdoer is not lost; for, as his [or her] acts did not justify upon the part of the other the use of deadly means for their prevention, his [or her] killing by the other would be criminal, and one may always defend himself [or herself] against the criminal attempt to take his [or her] life. But in contemplation of the weakness and passions of men [or women], and of the provocation, which, though

20

inadequate, was wrongfully put upon the other, it is the duty of the first wrongdoer, before he [or she] can avail himself [or herself] of the plea to have retreated to the wall, to have declined the strife, and withdrawn from the difficulty, and to have killed his [or her] adversary, under necessity, actual or apparent, only after so doing. *If, however, the counter assault be so sudden and perilous that no opportunity be given to decline or to make known to his [or her] adversary his [or her] willingness to decline the strife, if he [or she] cannot retreat with safety, then, as the greater wrong of the deadly assault is upon his [or her] opponent, he [or she] would be justified in slaying forthwith in self-defense.*" (*Id*. at p. 464, italics added.)

Here, there is substantial evidence, in the form of defendant's testimony, he committed a simple assault upon Maxey by shoving him to the ground after Maxey approached him with his pants down. Maxey's counter assault, according to defendant's account, was to throw bleach in his face. Defendant's eyes instantly shut and his face burned. He then felt an impact on the top of his head. Pulling out a pocket knife and backing out of Maxey's bedroom, defendant said: "I have a knife" and "I just want to get out of here." Unable to see, defendant began swinging the knife as he felt his way into the living room. Before he reached the front door, defendant heard the sound of "feet stampeding towards [him]," which caused defendant to panic, and "swinging the knife even harder," he inadvertently stabbed Maxey in the neck. Thus, under defendant's version of events, he tried to stop fighting, indicated to Maxey he wanted to stop fighting, and gave Maxey a chance to stop fighting by backing out of the bedroom in an attempt to leave the apartment. The bracketed portion of the instruction would have applied only if Maxey responded with such sudden and perilous force defendant was unable to withdraw from the fight or indicate to Maxey his desire to do so. There is no substantial evidence to support this view of the facts. Indeed, defendant's own testimony indicates that,

despite being splashed in the face with bleach, he did withdraw from the fight and told Maxey as much.

There was no instructional error.

DISPOSITION

The judgment is affirmed.


            HOCH , J.


We concur:


 HULL , Acting P. J.


 ROBIE , J.